IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BRITTNEY GARNER and DAVID DAIGLE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:25-CV-736-RP |
| | § | |
| TRAVIS COUNTY EMERGENCY | § | |
| SERVICES DISTRICT NO. 1, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**ORDER**

Before the Court is Defendant Travis County Emergency Services District No.1's ("TCESD1") Motion to Dismiss the Claims of Brittney Garner as Alleged in Her First Amended Complaint, (Dkt. 8), Defendant TCESD1's Motion to Dismiss the Claims of David Daigle as Alleged in His First Amended Complaint, (Dkt. 9), Defendant TCESD1's First Renewed Opposed Motion to Sever and Alternative Motion to Bifurcate, (Dkt. 16), and Defendant TCESD1's Opposed Motion to Defer Entry of a Scheduling Order, (Dkt. 19). Having considered the parties' briefs, the evidence, and the relevant law, the Court will grant in part and deny in part the motions to dismiss; deny the motion to sever; deny the motion to bifurcate without prejudice; and dismiss as moot the motion to defer entry of a scheduling order.

**I. BACKGROUND**

Plaintiffs Brittney Garner ("Garner") and David Daigle ("Daigle") (jointly, "Plaintiffs") were employed by TCESD1, an emergency services district created to provide fire protection, rescue, and emergency medical services for certain parts of Travis County, Texas. (Am. Compl., Dkt. 7, at 2; Mot. to Dismiss Garner, Dkt. 8, at 1). Garner was employed as a Battalion Chief; she alleges that she was the highest-ranking woman within TCESD1 and the only woman in upper management. (Am. Compl., Dkt. 7, at 3). Daigle was employed as a Captain. (*Id.*). Both had worked at TCESD1 since

2008. (*Id.* at 2). Plaintiffs claim that, prior to the subsequently described events, they were subject to only "minor . . . disciplinary actions" and had "performed their duties at or above the standards applied to the other employees of similar rank and title." (*Id.* at 3).

According to Garner, she experienced "several incidents of gender-based disparate treatment from Chief Norman," the Chief of TCESD1. (*Id.*). She claims she did not report these incidents when they occurred because she feared retaliation or "an escalation of the disparate treatment from Chief Norman and possibly some of the other (all male) upper management officers."[1] (*Id.*). She alleges that her promotion to Battalion Chief was "a result of [her] keeping her complaints of gender-based disparate treatment to herself." (*Id.*).

In February 2023, TCESD1 employees were asked to take a survey by TCESD1's union representative. (*Id.* at 5). Plaintiffs allege that the survey resulted in "multiple negative reports regarding Chief Norman's and the [TCESD1's] management practices in general." (*Id.* at 5). Garner alleges that she reported a culture of "sexual harassment and gender discrimination . . . created and perpetuated by Chief Norman . . . and others within [TCESD1's] all-male upper management." (*Id.*). According to Plaintiffs, Chief Norman "spoke out publicly . . . that he did not trust the anonymous survey results," and they allege he did not trust the results because they criticized him. (*Id.*). Chief Norman then "hire[d] a friend of his, retired Fire Chief Mark Borchardt ("Borchardt"), to re-interview" the TCESD1 employees, "instead of hiring someone independent." (*Id.*).

Garner alleges that, though she was concerned this "re-survey" would not be anonymous, she "repeated [to Borchardt] the complaints she had reported in the anonymous survey about gender discrimination and sexual harassment from Chief Norman." (*Id.* at 7). Garner further claims that Borchardt told Chief Norman what Garner had reported to him. (*Id.* at 8). According to

---

[1] Garner acknowledges that certain alleged incidents of gender-based disparate treatment are barred by the statute of limitations. (*Id.* at 4). She pleads that she refers to these incidents as relevant background information, rather than as actionable claims. (*Id.*).

Garner, Chief Norman "reacted negatively" to her reports against him by "making changes to the shifts and schedules which negatively impacted multiple firefighters and officers and then, in retaliation . . . blamed the need for those schedule changes on [Garner]." (*Id.*). Garner reports that this incident of changing the schedule and blaming it on her occurred approximately one month after she reported gender discrimination and sexual harassment to Borchardt. (*Id.*). She states that she was subsequently ostracized by the other male officers, which "can be very dangerous in a profession like firefighting and EMS service." (*Id.*). Due to this danger, she claims that "this type of retaliatory mistreatment would cause a reasonable firefighter and officer to be dissuaded from complaining against Chief Norman's discriminatory, harassing, or retaliatory actions," if they knew they would face the same treatment. (*Id.*).

During that same month, Garner alleges that one of her new subordinates reported to her that "Chief Norman had instructed [him] to present Chief Norman with any information that Chief Norman might be able to use to justify terminating [Garner's] employment."[2] (*Id.* at 9). Garner asserts that no other TCESD1 officer or subordinate was subject to the same false blame or threats of termination. (*Id.*). She alleges that she again chose to not complain about Chief Norman's "retaliatory nature" because she feared further harassment and retaliation. (*Id.*). She contends that TCESD1 took no action "to stop or correct Chief Norman's illegal actions" after she reported his "discriminatory and sexually harassing behavior during the anonymous survey and the Borchardt non-anonymous re-survey." (*Id.*).

Three months later, in August 2023, Daigle alleges that Chief Norman made a harassing comment to him in front of his crew. (*Id.* at 11). Daigle reports that Chief Norman remarked that more TCESD1 employees should have children. (*Id.*). Chief Norman "also specifically called out

---

[2] Garner alleges that Chief Norman needed the subordinate to give him a reason to terminate her employment because she had no "existing work-related allegations, conduct or performance issues, or disciplinary actions in place." (*Id.* at 9).

[Daigle], who has children, stating that [Daigle] should have more children." (*Id.*). When Daigle responded that his wife can no longer conceive children, he alleges that Chief Norman made "the lewd[] and sexually offensive and harassment statement that Chief Norman, 'could help her with that.'" (*Id.*). Daigle states that this comment was highly offensive and that he found it embarrassing for his commanding officer to make "such a sexually aggressive comment" in the presence of Daigle's subordinates. (*Id.*).

Daigle alleges that Captain Norman had previously made "sexually degrading" comments to him but that this comment "was simply too much to bear," so Daigle submitted a formal complaint of sexual harassment against Chief Norman "with [TCESD1] administration."[3] (*Id.* at 11–12). TCESD1, through its Board President Tony Marshall ("Marshall"), investigated Daigle's complaint against Chief Norman. (*Id.* at 12). As part of his investigation, Marshall interviewed Garner. Garner "again reported . . . that Chief Norman had sexually harassed her several times in the past." (*Id.*). She claims that she spoke out "because she was not complaining by herself" this time and "to show that Chief Norman's sexual harassment against [Daigle] was not an isolated incident." (*Id.* at 12). As a result of TCESD1's investigation into his remark to Daigle about his wife, Chief Norman was suspended for one month. (*Id.* at 13). Chief Norman was also required to apologize to Daigle for his comment. (*Id.*).

Approximately one week after Chief Norman was suspended, Plaintiffs allege that TCESD1, "through one or more of its management representatives . . . decided to retaliate against [Daigle] . . . by initiating an unprecedented investigation against [Daigle] for damage caused to a vehicle." (*Id.* at 14). Plaintiffs contend that the damage to the vehicle had occurred at least two weeks prior to the investigation beginning. (*Id.*) They assert that the investigation was unprecedented because no one

---

[3] Daigle states in his Response to the Motion to Dismiss that he "voluntarily withdraws his claim of sexual harassment" and that this comment from Chief Norman goes towards his gender discrimination claim. (Daigle Resp., Dkt. 11, at 3 n.1).

had ever been placed under investigation for the same or similar allegations, even though multiple incidents involving damage to vehicles and property had occurred previously. (*Id.*). They similarly state that no investigation had previously been conducted for damage to property, even when the damage was more extensive than that cause by Daigle; that no investigation had been performed "in the same manner, procedure, or extent compared to the investigation conducted against Capt. Daigle"; and that no investigation "had been conducted by an employee subordinate to the person accused of the issue being investigated." (*Id.*). Plaintiffs allege that, based on the "intensity and extent of the investigation" and "the fact that it was occurring within two weeks of the conclusion of the investigation and substantiation of [Daigle's] complaint of sexual harassment against Chief Norman," multiple employees expressed concern that Chief Norman and "his supporters" were retaliated against Daigle. (*Id.*). Daigle also reports that he was "threatened, harassed, humiliated, had his reputation and authority challenged, and therefore treated differently from the other similarly situated [TCESD1] officers/employees that [had] damaged property [but] had not engaged in protected activities." (*Id.*).

The investigation into Daigle was done by FF Colunga, who was in Daigle's chain of command. (*Id.* at 15). The damage he caused to the vehicle was estimated to be approximately $600.00, and Plaintiffs allege that, to their knowledge,[4] the repairs were not made to the vehicle. (*Id.*). TCESD1 completed its investigation into Daigle on or about September 16, 2023.[5] (*Id.*). After FF Colunga turned in his investigation report, he spoke to Garner "for some guidance on how to handle . . . the fact that [he] was being negatively perceived and treated by the other TCESD1 employees." (*Id.*).

---

[4] More specifically, they allege that, at least by the time TCESD1 terminated Daigle three months later, the repairs had not been made, beyond paint scrapes being buffed out at no expense. (*Id.* at 15).
[5] According to Plaintiffs, TCESD1 ultimately did not discipline Daigle for the damage. (*Id.* at 17). Plaintiffs allege that they could not discipline him because doing so would be clear evidence of retaliation and disparate treatment. (*Id.*).

Approximately three weeks after the conversation between Garner and FF Colunga, Garner was accused of telling FF Colunga to alter or falsify his report. Plaintiffs plead that, because this conversation occurred after his investigation report was completed, Garner could not have told FF Colunga to change his report or his investigation techniques. (*Id.* at 17). Garner was placed on leave on October 4, 2023, pending an investigation into her alleged violations from her conversation with FF Colunga. (*Id.* at 18). She alleges that her being placed on leave occurred one day before Chief Norman was to return to work after his one-month suspension, and she claims this timing was not a coincidence. (*Id.*). On October 26, 2023, during her leave, Garner filed a written complaint of retaliation against TCESD1. (*Id.* at 20). Garner remained on leave pending this investigation until December 23, 2023 (approximately 2.5 months later), at which point she was terminated. (*Id.*).

Earlier, on October 5, 2023, the day after Garner was placed on leave and the day Chief Norman returned to work, Chief Norman and Daigle had a conversation in which Chief Norman allegedly tried to get Daigle to blame Garner for Daigle's sexual harassment complaint against Chief Norman (i.e., that she had influenced him to make the complaint). (*Id.* at 19). Daigle denied that she had done so. (*Id.*). Subsequently, on November 29, 2023, Daigle was interviewed as part of the investigation into Garner and her conversation with FF Colunga. (*Id.* at 21). In that interview, Daigle reported that Chief Norman had tried to get Daigle to agree that Garner had influenced him to make his complaint of sexual harassment in August. (*Id.*). Daigle was terminated two weeks later on December 15, 2023, "for allegedly misrepresenting what Chief Norman had said during that meeting with Capt. Daigle on October 5, 2023."[6] (*Id.*).

---

[6] Plaintiffs allege that TCESD1 claims to have a recording that Chief Norman took of this meeting, but TCESD1 has purportedly refused to provide a copy of it to Plaintiffs. (*Id.* at 21). Daigle was permitted to hear portions of the recording during his termination meeting, and he claims the recording was "not consistent with his memory" of the meeting. (*Id.*). Plaintiffs allege that the recordings were edited to support TCESD's allegation that Daigle had lied about Chief Norman's comments during the October 5 meeting. (*Id.*).

Based on these allegations, Plaintiffs bring claims under Title VII for discrimination and retaliation. (*Id.* at 24–25). Plaintiffs assert that they were treated differently than employees who are male and act within the norm for their gender and differently than employees who did not engage in protected activity. (*Id.* at 23). They each claim that, based on the adverse employment actions taken against them, reasonable employees would be dissuaded from complaining about discrimination, harassment, and retaliation against Chief Norman and TCESD1. (*Id.* at 8, 24). Finally, Plaintiffs allege that, as a result of TCESD1's gender discrimination and retaliation, they suffered and continue to suffer economic and non-economic damages. (*Id.* at 23–24).

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

TCESD1 separately moves to dismiss Garner's and Daigle's claims. (Dkts. 8, 9). The Court will consider the two motions in turn. The Court will then discuss TCESD1's motion to sever and alternative motion to bifurcate. (Dkt. 16).

### A. The Motion to Dismiss Garner's Claims

TCESD1 moves to dismiss Garner's sex discrimination claim for failure to administratively exhaust the claim and for failure to state a claim. (Mot. to Dismiss Garner, Dkt. 8, at 3–6). It also moves to dismiss her retaliation claim for failure to state a claim. (*Id.* at 6–7). The Court will grant the motion to dismiss her sex discrimination claim but deny the motion to dismiss her retaliation claim.

### 1. Garner's Title VII Sex Discrimination Claim

The Court first considers whether Garner has administratively exhausted her sex discrimination claim. Exhaustion under Title VII occurs when an individual files a timely charge of

discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), the charge is dismissed by the EEOC, and the EEOC informs the individual of the right to sue. *Hall v. Cont'l Airlines, Inc.*, 252 F. App'x. 650, 653 (5th Cir. 2007); 42 U.S.C. § 2000e-5 (e) and (f). Timely filing an EEOC charge is a precondition to filing suit in federal district court. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). In assessing the sufficiency of a charge, the Fifth Circuit has noted two dueling principles: "(1) [c]onsistent with the remedial purposes underlying Title VII, we construe employment discrimination charges with the utmost liberality, bearing in mind that such charges are generally prepared by laymen untutored in the rules of pleading, and (2) the charge must contain an adequate factual basis so that it puts the employer on notice of the existence and nature of the charges and so the EEOC may have an opportunity to attempt to obtain voluntary compliance." *Preston v. Texas Dep't of Family & Protective Servs.*, 222 F. App'x 353, 356–57 (5th Cir. 2007). *See also Jennings v. Towers Watson*, 11 F.4th 335, 342 (5th Cir. 2021) (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017) ("In determining whether a plaintiff has exhausted a particular claim, 'the scope of an EEOC complaint should be construed liberally.'"). In balancing these considerations, the Fifth Circuit allows Title VII suits based "not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Jennings*, 11 F.4th at 342 (quoting *Patton*, 874 F.3d at 443).

TCESD1 argues that Garner's EEOC charge only contains allegations regarding her retaliation claim. (Mot. to Dismiss Garner, Dkt. 8, at 4). The Court disagrees. In the box on the EEOC charge form titled "DISCRIMINATION BASED ON," Garner answered, "Gender/Sex and Retaliation."[7] (Garner EEOC Charge, Dkt. 7, at 30). She also alleges that she is the only woman

---

[7] The Court can consider the EEOC charges at this stage in the litigation because it is attached to Plaintiffs' First Amended Complaint. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 488–89 (5th Cir. 2000)) ("The court's review [at

in upper management at TCESD1 and that Chief Norman had "criticized her for 'mothering' her crew." (*Id.* at 30). Garner additionally references in the EEOC charge that she had made internal complaints of sexual harassment. These allegations are more than sufficient for the resulting EEOC investigation to reasonably include an investigation into sex discrimination. *See Jennings*, 11 F.4th at 342.

The Court next examines whether Garner has sufficiently pleaded a claim of sex discrimination. Under Title VII, it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to survive a motion to dismiss in this context, "a plaintiff need not make out a prima facie case of discrimination under *McDonnell Douglas*." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)). But a plaintiff must "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make their case plausible." *Id.* (quoting *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016)). "[T]here are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action, (2) taken against a plaintiff *because of* her protected status." *Id.* at 767 (emphasis in original). To establish these elements, plaintiff must sufficiently plead facts to "nudge [her] claims across the line from conceivable to plausible." *Id.* (quoting *Twombly*, 550 U.S. at 547).

The Court agrees with TCESD1 that Garner has not sufficiently alleged facts to make it plausible that she experienced an adverse employment action due to her gender. She vaguely alleges

---

the motion-to-dismiss stage] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.").

that she reported "sexual harassment and gender discrimination" in the February 2023 anonymous survey, (Am. Compl., Dkt. 7, at 5), but she provides no factual allegations explaining what actions or statements constituted this harassment and discrimination.[8] "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)). She pleads that she is the only woman in upper management within TCESD1, and her EEOC charge alleges that Chief Norman criticized her for "mothering" her crew. (*Id.* at 3; EEOC Charge, Dkt. 7, at 30). None of these allegations support that she suffered "some 'disadvantageous' change in an employment term or condition" as a result of her gender, *see Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354 (2024), as she does not plausibly connect these allegations to her termination or any other adverse employment action.

In her Response, Garner points to the following allegations as establishing she suffered harm respecting a term or condition of her employment: (1) she alleges experiencing "several incidents of gender-based disparate treatment"; (2) she alleges that she was othered, criticized, and ostracized by the male officers and firefighters; (3) she alleges being targeted for termination "without any legitimate non-discriminatory or non-retaliatory justification"; and (4) she alleges that "no other [TCESD1] officer or subordinate was subjected to the same non-policy-based discriminatory or retaliatory false blame, [or] threats of attacks/termination."[9] (Garner Resp., Dkt. 10, at 7).

As to her first argument, Garner explicitly acknowledges in her pleading that some of these incidents of disparate treatment cannot be the basis of her sex discrimination claim, as they occurred prior to the actionable period. (Am. Compl., Dkt. 7, at 3–4) ("During [Garner's] employment within

---

[8] Garner also pleads that she experienced several incidents of gender-based disparate treatment from Chief Norman," but acknowledges that these incidents cannot be the basis of her sex discrimination claim, as they occurred prior to the actionable period. (Am. Compl., Dkt. 7, at 3–4).

[9] Though some of these allegations may support a hostile work environment claim, Garner did not plead such a claim.

ESD1, she experienced several incidents of gender-based disparate treatment from Chief Norman . . . . Garner does not plead those incidents of gender-based disparate treatment that occurred prior to the actionable period as actionable claims in this matter due to the statute of limitations"). Even if some of these "incidents of gender-based disparate treatment" are actionable, Garner never provides any specific factual allegations detailing what these incidents were or when they occurred. Such conclusory allegations are not enough to survive a motion to dismiss. *See Chhim*, 836 F.3d at 469 ("We take the well-pleaded factual allegations in the complaint as true, but we do not credit conclusory allegations . . . .").

As to her second, third, and fourth argument, none of these allegations "allow[] the court to draw the reasonable inference" that her ostracization and termination were caused by her gender. *See Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595 (5th Cir. 2021) (quoting *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018)). To the contrary, the only non-conclusory facts pleaded to support her assertion that she was treated differently are about her protected activities—not her gender. Merely pleading that she was discriminated against due to her gender without factual support and without facts tethering that alleged discrimination to an adverse employment action does not meet the bar set by Federal Rule of Civil Procedure 8(a). *See Iqbal*, 556 U.S. at 678 ("[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement.") (citation modified). The Court will therefore grant TCESD1's motion to dismiss Garner's sex discrimination claim.

### 2. Garner's Title VII Retaliation Claim

To establish a claim for retaliation under Title VII, the plaintiff must plausibly allege that (1) she engaged in a protected activity; (2) there was a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015). "A retaliation claim that is premised on a pretextual rationale for dismissal is analyzed under the *McDonnell Douglas* framework." *Royal v. CCC & R Tres*

*Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). As with Title VII discrimination claims, a plaintiff

bringing a Title VII retaliation claim "does 'not have to submit evidence to establish a prima facie

case ... at [the pleading] stage.' . . . . Rather, [the plaintiff] only needed 'plausibly [to] allege facts

going to the ultimate elements of the claim to survive a motion to dismiss.'" *Wright v. Union Pac. R.R.*

*Co.*, 990 F.3d 428, 433 (5th Cir. 2021) (first quoting *Chhim*, 836 F.3d at 470; and then quoting

*Cicalese*, 924 F.3d at 768).

Garner pleads that she engaged in protected activity by making internal complaints about

Chief Norman, that she suffered materially adverse actions by being placed on leave, investigated,

and ultimately terminated, and that these materially adverse actions were taken against her due to her

complaints. TCESD1 argues that Garner's retaliation claim should be dismissed because her

pleadings fail to "identify a particular protected activity and link it, through temporal proximity or

other factors, to a materially adverse employment action." (Mot. to Dismiss Garner, Dkt. 8, at 7).

The Court disagrees with TCESD1. The Fifth Circuit has held that the following factors are

"prototypical indicator of decisionmaker knowledge (and of causation in a broader sense)":

"temporal proximity, specific conversations with knowledgeable colleagues, changed decisionmaker

behavior following complaints, pretext, and parallel outcomes for similarly-situated employees."

*Robinson v. Jackson State Univ.*, 714 F. App'x 354, 361 (5th Cir. 2017) (per curiam). The timeline of

Garner's protected activities and the alleged adverse actions taken against her is approximately as

follows: (1) She anonymously reported Chief Norman for sexual harassment and gender

discrimination in February 2023; (2) she subsequently repeated these complaints to Borchardt, who

was "a friend" of Chief Norman's and "re-surveyed" the TCESD1 employees in approximately

April 2023;[10] (3) in May 2023, which was approximately one month after she made complaints to

---

[10] Plaintiffs do not plead when exactly the "re-survey" occurred, though they do allege it was approximately
one month prior to May 2023. (Am. Compl., Dkt. 7, at 9–10).

Borchardt, Chief Norman "blamed" schedule changes on Garner, such that she was "ostracized . . .
by the other male officers and firefighters," and Chief Norman allegedly asked one of Garner's
subordinates to report to him any information he could use to justify terminating Garner; (4) on
October 4, 2023, Garner was placed on leave pending an investigation into her conversation with FF
Colunga; (5) on October 26, 2023, Garner filed a written complaint of retaliation against ESD1 and
Chief Norman; and (6) on December 23, 2023, Garner was terminated.  (Am. Compl., Dkt. 7, at 5–
9, 18, 20).

       Multiple factors approved by the Fifth Circuit in *Robinson* support that, at this stage of the
litigation, Garner has pleaded sufficient facts to make it plausible she was retaliated against for her
protected activity. First, Plaintiffs contend that both Garner and Daigle—the only two TCESD1
employees alleged to have made complaints against Chief Norman for sexual harassment—were
fired in December 2023. (Am. Compl., Dkt. 7, at 23). She therefore has alleged that the only other
similarly situated employee was treated similarly. Second, Plaintiffs allege that Chief Norman
attempted to blame Daigle's complaint of sexual harassment on Garner. (Am. Compl., Dkt. 7, at 19–
20). A reasonable jury could infer from this interaction that Chief Norman knew that Garner had
previously reported him for sexual harassment. Third, Chief Norman blaming Garner for schedule
changes and asking Garner's subordinate to provide him with reasons to justify firing Garner
approximately one month after Garner made complaints of sexual harassment to Borchardt could
be seen by a jury as "changed decisionmaker behavior following [a] complaint[]." *See Robinson*, 714 F.
App'x at 361. Fourth, Garner was placed on suspension one day before Chief Norman returned to
work from his suspension. (Am. Compl., Dkt. 7, at 18). Finally, Garner was terminated
approximately two months[11] after she allegedly filed a written complaint of retaliation against

---

[11] The Fifth Circuit has held that a period of two months is close enough to show a causal connection. *Garcia
v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (citing *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987,

TCESD1 and Chief Norman. (Am. Compl., Dkt. 7, at 20, 22). The Court finds Garner's allegations sufficient at this stage to make it plausible that she was retaliated against for her protected activities.

## B. The Motion to Dismiss Daigle's Claims

TCESD1 moves to dismiss Daigle's sex discrimination claim for failure to administratively exhaust the claim and for failure to state a claim. (Mot. to Dismiss Daigle, Dkt. 9, at 2). It additionally moves to dismiss his retaliation claim for failure to state a claim. (*Id.* at 13). The Court will grant the motion to dismiss his sex discrimination claim but deny the motion to dismiss his retaliation claim.[12]

### 1. Daigle's Title VII Sex Discrimination Claim

The Court first considers whether Daigle has administratively exhausted his sex discrimination claim.[13] As with Garner, the Court finds that he has. In the box titled "DISCRIMINATION BASED ON," Daigle wrote: "Gender/Sex, Sexual Harassment and Retaliation." (Daigle EEOC Charge, Dkt. 7, at 31). He also wrote that he was "criticized as a different/less-than kind of man . . . [for] acting outside of the male normal as determined by Chief Norman and Chief Robeson." (*Id.*). The Fifth Circuit has "recognized that a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes." *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 454 (5th Cir. 2013) (en banc). It is therefore reasonable that the EEOC investigation resulting from Daigle's charge would include an investigation of sex discrimination, meaning he has properly exhausted his sex discrimination claim. *See Jennings*, 11 F.4th at 342 (quoting *Patton*, 874 F.3d at 443) (stating that administrative exhaustion is determined "not solely by the scope of the administrative charge itself,

---

994–95 (5th Cir. 2005)) ("This court has previously held that a period of two months is close enough to show a causal connection.").

[12] As noted in footnote 3, *supra*, Daigle states in his Response to the Motion to Dismiss that he "voluntarily withdraws his claim of sexual harassment." (Daigle Resp., Dkt. 11, at 3 n.1).

[13] The legal standard for administrative exhaustion is discussed in Section III(A)(1), *supra*.

but by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").

The Court next examines whether Daigle has sufficiently pleaded a claim of sex discrimination.[14] Like Garner, the Court concludes that Daigle has not. Daigle alleges that he experienced "multiple incidents of gender-based disparate treatment from Chief Norman for not acting . . . within the norm for a male firefighter as expressed by Chief Norman." (Am. Compl., Dkt. 7, at 4). He states that Chief Norman criticized him "for being "different," "sensitive," caring for subordinates' "emotions/feelings," being "vegan," [and] practicing "yoga" during shifts." (*Id.* at 4). Daigle does not provide the Court with the approximate dates these alleged comments were made. Daigle also pleads that in August 2023, Chief Norman made a "lewd[] and sexually offensive and harassing statement . . . about having sex with [Daigle's] wife." (*Id.* at 11).

As noted above, Daigle is correct that he can bring a sex discrimination claim for adverse employment actions taken against him for acting outside of expected gender norms. *See Boh Bros. Const. Co.*, 731 F.3d at 454. But he does not provide any factual allegations to connect an adverse employment action, such as the investigation into him or his termination, to his failure to follow gender stereotypes. Daigle argues in his Response that he pleaded he was harmed because of his gender in the following ways: (1) he was criticized for his non-stereotypical conduct/behavior . . . and thus ostracized and humiliated; (2) he was subjected to emasculating comments from Chief Norman in front of his subordinate[s] and thus ostracized and humiliated; (3) he was subjected to unprecedented allegations and investigation; (4) he was pressured by Chief Norman into providing false testimony against Garner; and (5) he was terminated for fabricated, false, and pretextual reasons. (Daigle Resp., Dkt. 11, at 8). The Court disagrees that these allegations give rise to a plausible claim for sex discrimination. Being "criticized," "ostracized," or "subjected to emasculating

---

[14] The legal standard for Title VII sex discrimination claims is discussed in Section III(A)(1), *supra.*

comments" is not a change to his "terms or conditions" of employment.[15] Moreover, Daigle does not plead any factual allegations suggesting that his being pressured to provide testimony against Garner or his subsequent termination were because of him failing to adhere to gender stereotypes. Rather, the only factual allegations connected to the investigation into him and his termination are about retaliation. *See, e.g.*, Am. Compl., Dkt. 7, at 14 ("Given the intensity and extent of the investigation, the fact that it was occurring within two weeks of the conclusion of the investigation and substantiation of Capt. Daigle's complaint of sexual harassment against Chief Norman, and its unprecedented nature and extent, there was a lot of concern and talk amongst the [TCESD1] employees . . . that Chief Norman and his supporters were engaged in retaliating against [Daigle].''). The Court will therefore grant TCESD1's motion to dismiss Daigle's sex discrimination claim.

## 2. Daigle's Title VII Retaliation Claim

Daigle pleads that the investigation into him and his termination were in retaliation for his reporting Captain Norman for sexual harassment and subsequently refusing to blame his report on Garner. (Am. Compl., Dkt. 7, at 11–15, 19, 21–22). Daigle reported Captain Norman in August 2023 for sexual harassment related to the lewd comment Captain Norman made about Daigle's wife. (*Id.* at 11–12). Approximately one week after Chief Norman was placed on involuntary suspension as a result of Daigle's sexual harassment complaint, Daigle alleges that TCESD1 "initiat[ed] an unprecedented investigation" into him for causing damage to a vehicle. (*Id.* at 14). Daigle pleads that other individuals had caused similar damage to vehicles, including "within weeks and months" of the damage he caused, but nobody had "ever been placed under investigation for the same or similar allegations." (*Id.* at 14). He claims more broadly that "no investigation had previously been performed in the same manner, procedure, or extent compared to the investigation conducted

---

[15] Though these allegations may give rise to a hostile work environment claim, Daigle did not plead such a claim.

17

against [him]." (*Id.*) Daigle further pleads that, "[h]ad a reasonable employee known that they were going to be subject to such unprecedented negative treatment . . . because of complaining about sexual harassment from Chief Norman . . . they would likely be dissuaded from complaining against Chief Norman." (*Id.* at 15).

Daigle also alleges that, once Chief Norman returned to work from his suspension on October 5, 2023, Chief Norman met with Daigle and attempted to blame Daigle's report on Garner. (*Id.* at 19). According to Daigle, he refuted this assertion and "specifically stated to Chief Norman that [he] had decided to file the complaint against Chief Norman on his own without any input from [Garner] or anyone else." (*Id.*). Subsequently, on November 29, 2023, Daigle was interviewed as part of the investigation into Garner. (*Id.* at 21). He reportedly told the interviewer about his conversation with Chief Norman—i.e., that Chief Norman tried to have Daigle admit that Garner had influenced him into making his sexual harassment complaint. (*Id.*). TCESD1 then fired Daigle two weeks later "for allegedly misrepresenting what Chief Norman had said during that meeting . . . on October 5, 2023." (*Id.*).

The Court finds that Daigle has plausibly alleged the three elements of a Title VII retaliation claim.[16] First, he engaged in a protected activity in August 2023 by reporting Captain Norman for sexual harassment.[17] (*Id.* at 12). *See Rodriguez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 329 (5th Cir. 2013) (explaining that internal complaints are protected activities if they "reference discrimination or any other unlawful employment activity"). Second, Daigle has sufficiently pleaded that the investigation into him and his termination were materially adverse actions. TCESD1 solely addresses

---

[16] The legal standards for a Title VII retaliation claim are explained in Section III(A)(2), *supra*.
[17] The Court need not reach whether Captain Norman's statement did in fact constitute sexual harassment. Under Title VII, an employee has engaged in protected activity if he has "opposed any practice made an unlawful employment practice [by Title VII]" or that he "reasonably belie[v]ed" was made unlawful by Title VII. *See Byers v. Dall. Mornings News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000) (quoting *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)). Here, Daigle's belief that Chief Norman's comment about having sex with his wife constituted sexual harassment was reasonable.

Daigle's termination as an adverse employment action. (Mot. to Dismiss Daigle, Dkt. 9, at 14). Some courts have held, however, that an internal investigation may meet the standard set forth by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), i.e., that the action taken by the employer might have dissuaded a reasonable employee from performing a protected activity. *See, e.g., Rodriguez v. City of Laredo*, No. 5:06-CV-175, 2007 WL 2329860, at *3 (S.D. Tex. Aug. 13, 2007) (stating that "petty workplace incivilities must be distinguished from employer harassment achieved through the summoning of overbearing institutional power. Employer investigations vary; some can be extremely intimidating"); *Allen v. Hammond City Police Dep't*, No. CV 19-12117, 2020 WL 433359, at *7 (E.D. La. Jan. 28, 2020) (reasoning that, "in some cases, the potential or actual consequences of an internal investigation . . . can be sufficient to satisfy" the "materially adverse" standard from *Burlington Northern*); *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (holding that a reasonable jury could find that the prospect of a "lengthy investigation" that "placed a cloud over [one's] career" could "dissuade a reasonable employee" from engaging in a protected activity). The Court finds that, at this early stage in the litigation, Daigle has sufficiently pleaded that the investigation into him, as well as his termination, were materially adverse actions.

Finally, Daigle must plausibly allege that a causal connection exists between his protected activity and the adverse actions. As to the investigation into Daigle, the extremely close temporal proximity between Captain Norman's suspension and the initiation of the investigation into Daigle—approximately one week later—is sufficient for the Court to infer causation at this stage of the litigation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that "very close" temporal proximity can be sufficient evidence of causality). This inference is made even stronger considering Daigle's allegation that no other employee had been investigated for similar vehicle damage. Daigle has therefore sufficiently alleged a retaliation claim stemming from the investigation into the vehicle damage he caused.

As to Daigle's retaliation claim related to his termination, TCESD1 argues that Daigle did not allege any facts to suggest who the final decisionmaker was and did not allege facts to suggest that his protected activity was the motivation behind his termination. (Mot. to Dismiss Daigle, Dkt. 9, at 14). To the contrary, at the motion-to-dismiss stage, the Court need only be able to reasonably infer "that the employer knew about the employee's protected activity." *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003). Here, the Court can easily infer that, by Daigle internally reporting Chief Norman for sexual harassment "with [TCESD1] administration" and then reporting in an interview that Chief Norman attempted to blame such report on Garner, management at TCESD1 knew of his protected activity. In other words, his protected activity itself is what plausibly gave TCESD1 knowledge. There is no requirement that Daigle identify a specific person as the decisionmaker behind his termination at this stage. *See, e.g.*, *Smith v. Kendall*, No. 23-50713, 2024 WL 4442040, at *8 (5th Cir. Oct. 8, 2024) (citing *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 306 & n.29 (5th Cir. 2020)) (acknowledging that the Fifth Circuit has held that a prima facie case of retaliation can be established even when it is "not clear from the record who" the decisionmaker was); *Briceno-Belmontes v. Coastal Bend Coll.*, No. 2:20-CV-00114, 2022 WL 673854, at *7 (S.D. Tex. Mar. 5, 2022) (quoting *Twombly*, 550 U.S. at 556) (reasoning that the plaintiff had sufficiently pleaded employer knowledge by alleging that she made protected complaints to multiple superiors, as this provided "enough facts to raise a reasonable expectation that discovery will reveal evidence" regarding the decisionmaker and their knowledge).

Moreover, the Court finds Daigle did sufficiently plead facts supporting that his protected activity—reporting Captain Norman for sexual harassment—was the motivation behind his termination. TCESD1 is correct that the fourth-month gap between his report and his termination is too long to plausibly allege causation, *see* Reply, Dkt. 13, at 10, but the precedent TCESD1 cites involved temporal proximity as the sole evidence of causation. *See Breeden*, 532 U.S. at 273–74

20

(reviewing that "[t]he cases that accept *mere temporal proximity* between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'" and noting that courts have found periods of three or four months to be insufficient) (emphasis added); *Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 206 (5th Cir. 2007) ("Numerous courts have held that temporal proximity evidence *alone* cannot support an inference of causation when there is a four-month gap between the protected activity and the adverse employment action.") (emphasis added). In the instant case, though, Daigle has pleaded more than just temporal proximity. He has also pleaded that Garner, the only other employee alleged to have reported Chief Norman for sexual harassment, was similarly fired—a mere eight days after him. (Am. Compl., Dkt. 7, at 22). This is strong corroborating evidence of retaliation, and it is enough for his retaliation claim based on his termination to survive the motion to dismiss.

### C. TCESD1's Motion to Sever

TCESD1 also moves for the Court to sever Plaintiffs' claims or, in the alternative, to bifurcate their trials. (Mot. to Sever or Bifurcate, Dkt. 16, at 1, 19). District courts have broad discretion when deciding a motion to sever. *Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000). The relevant rules are Federal Rules of Civil Procedure 20 and 21. *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010) ("Since Rule 21 does not provide any standards by which district courts can determine if parties are misjoined, courts have looked to Rule 20 for guidance."). Rule 21 states: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. Rule 20 addresses the joinder of plaintiffs, and states:

Persons may join in one action as plaintiffs if:

> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1). Generally, courts consider the following factors when evaluating a motion to sever under Federal Rule of Civil Procedure 21: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Def. Distributed v. Bruck*, 30 F.4th 414, 431 (5th Cir. 2022). District courts liberally construe permissive joinder of claims and parties in the interest of judicial economy. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."); *Acevedo*, 600 F.3d at 521 (quoting *Gibbs*, 383 U.S. at 715).

<u>1. Same Transaction or Occurrence</u>

Transactions or occurrences are the "same" under Rule 20 if there is "some connection or logical relationship between the various transactions or occurrences." *MyMail, Ltd. v. Am. Online, Inc.*, 223 F.R.D. 455, 456 (E.D. Tex. 2004) (citing *Hanley v. First Investors Corp.*, 151 F.R.D. 76, 79 (E.D. Tex. 1993)). TCESD1 argues that Plaintiffs' claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences because they are based on separate incidents and do not have any meaningful factual overlap. (Mot. to Sever, Dkt. 16, at 6–11). Plaintiffs disagree, responding that they have alleged multiple operative facts supporting that their claims are logically related. (Resp. to Mot. to Sever, Dkt. 23, at 9).

The Court agrees with Plaintiffs. As discussed in Section I, *supra*, Plaintiffs plead that they worked for the same entity at the same location, worked under the same chief, both reported that chief for sexual harassment, were both terminated within one week of each other in December 2023, and were terminated based upon fabricated allegations without the opportunity to meaningfully defend themselves.[18] Their retaliation claims are therefore logically related and do arise out of the same series of transactions or occurrences.[19] *See, e.g.*, *Jones v. Wal-Mart Stores, Inc.*, No. 1:05-CV-121, 2006 WL 8441384, at *2 (E.D. Tex. Feb. 6, 2006) ("While Plaintiffs' claims arise from separate, discrete incidents, [their manager's] allegedly inappropriate sexual conduct towards his subordinates, if true, forms part of a logically related series of transactions or occurrences under Rule 20."); *Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 143 (N.D.N.Y. 1999) (holding in an age discrimination case that the "same transaction or occurrence' prong of Rule 20 was met where, "[d]espite the differences in the factual underpinnings of [the plaintiffs'] respective claims, plaintiffs have alleged a pattern of conduct"). Thus, this factor weighs against severance.

### 2. Questions of Law Or Fact Common to All Plaintiffs

Next, the Court examines whether the claims present common questions of law or fact. The Court again agrees with Plaintiffs that this factor is met. The issues of fact between Plaintiffs' claims are similar—they involve the same parties, similar allegations of retaliation for reporting sexual harassment against the same person, and termination within one week of each other. They also involve violations of the same law, Title VII. This factor therefore also weighs against severance.

---

[18] TCESD1 argues in its Reply that that the "legitimate, non-retaliatory reasons at issue for each decision are different, with Garner being fired for her comments to Colunga and Daigle being fired based on his misstating what happened during Norman's apology." (Reply to Mot. to Sever, Dkt. 24, at 9). But Plaintiffs have pleaded that their terminations were retaliatory and were supported by fabricated allegations, which the Court accepts as true at this stage of the litigation.

[19] The Court does not address TCESD1's arguments in their Motion to Sever, (Dkt. 16), or their Reply in Support, (Dkt. 24), that Plaintiffs' sex/gender discrimination claims do not arise under the same transaction or occurrence, as the Court has dismissed those claims.

### 3. Judicial Economy, Prejudice, and Evidence

Finally, the Court examines the three final factors for evaluating a motion to sever. TCESD1 contends that judicial economy is not served by keeping Plaintiffs' claims together because they are based on discrete events. As discussed above, however, the Court has already found that Plaintiffs have sufficiently alleged facts to demonstrate that their claims arise out of the same series of transactions or occurrences. Moreover, because Plaintiffs have alleged a pattern of TCESD1 retaliating against employees who made reports of sexual harassment, the Court agrees with Plaintiffs that there will be a number of witnesses in common between them, including Chief Norman, coworkers, management at TCESD1, and each other. It is therefore more efficient to keep Plaintiffs' claims together. *See Jones*, 2006 WL 8441384, at *2 (holding that judicial economy supported keeping the plaintiffs' Title VII claims together where the plaintiffs worked under the same management team with many of the same coworkers, and "separate trials for each plaintiff would likely involve the testimony of many of the same witnesses and the presentation of significant amounts of duplicative evidence"; *Disparte v. Corp. Exec. Bd.*, 223 F.R.D. 7, 16 (D.D.C. 2004) (reasoning that judicial economy weighs against severance where plaintiffs would "use some of the same evidence to show a pattern of discriminatory policies and practices").

Next, as to prejudice, TCESD1 claims that it will be "significantly prejudiced' by a joint trial because the jury will hear allegations made by each Plaintiff and testimony that have relevance to only one Plaintiff's claims, which may confuse the jury. This factor slightly weighs in favor of severance, though the risk of prejudice may be minimized by the Court issuing a limiting instruction. *See Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010) (quoting *United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003)) (acknowledging that giving a limiting instruction to a jury "minimizes the danger of undue prejudice").

Finally, many of the same witnesses would be expected to testify regarding each Plaintiffs' claims, and it would be burdensome for those witnesses to be required to testify on a similar issue—retaliation at TCESD1 for reporting sexual harassment—twice. This factor therefore weighs against severance. For the reasons stated above, the Court finds that Plaintiffs' claims should not be severed.

### D. TCESD1's Alternative Motion to Bifurcate

Should the Court not grant TCESD1's motion to sever Plaintiffs' claims, TCESD1 moves in the alternative for the Court to bifurcate their trials. "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims," though separation of issues is "not the usual course that should be followed." Fed. R. Civ. P. 42(b); *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 304 (5th Cir. 1993) (citations omitted). A motion to bifurcate is "within the sole discretion of the trial court," and denial of such a motion is reviewed on appeal for abuse of discretion. *Sims v. City of Jasper, Tex.*, 117 F.4th 283 (5th Cir. 2024) (quoting *Nester v. Textron, Inc.*, 888 F.3d 151, 162 (5th Cir. 2018)). Trying an issue separately should only be done when "the issue [is] so distinct and separable from the others that a trial of it alone may be had without injustice." *Id.* (quoting *Alabama v. Blue Bird Body Co.*, 575 F.2d 309, 318 (5th Cir. 1978)).

The Court finds that, at least at this stage of the litigation, most of the factors listed in Federal Rule of Civil Procedure 42—convenience, expedience, and economy—tilt towards keeping Plaintiffs' claims together. *See* Section III(C), *supra*. The Court finds, however, that this issue may be better addressed at a later date. The Court will therefore allow TCESD1 to renew its motion to bifurcate once trial is closer and a meaningful amount of discovery has been exchanged, should it believe bifurcation is still appropriate.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant TCESD1's Motion to Dismiss the Claims of Brittney Garner as Alleged in Her First Amended Complaint, (Dkt. 8), is **GRANTED IN PART AND DENIED IN PART**. Specifically, Garner's sex discrimination claim under Title VII is **DISMISSED**. With respect to Garner's Title VII retaliation claim, TCESD1's motion is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant TCESD1's Motion to Dismiss the Claims of David Daigle as Alleged in His First Amended Complaint, (Dkt. 9), is **GRANTED IN PART AND DENIED IN PART**. Specifically, Daigle's sex discrimination claim under Title VII is **DISMISSED**. With respect to Daigle's Title VII retaliation claim, TCESD1's motion is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant TCESD1's First Renewed Opposed Motion to Sever and Alternative Motion to Bifurcate, (Dkt. 16), is **DENIED**, such that its Alternative Motion to Bifurcate is **DENIED WITHOUT PREJUDICE**.

**IT IS FINALLY ORDERED** that Defendant TCESD1's Opposed Motion to Defer Entry of a Scheduling Order, (Dkt. 19), **IS DISMISSED AS MOOT**.

**SIGNED** on October 29, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE